**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **NATIONWIDE AGRIBUSINESS INSURANCE COMPANY, as subrogee of SEM Minerals, Inc.,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | **No. 23 C 1988** |
| **v.** | ) ) | **Judge Rebecca R. Pallmeyer** |
| **USG CORPORATION,** | ) ) | |
| **Defendant.** | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendant USG Corporation ("USG") sold calcium sulphate[1] to SEM Minerals, Inc. ("SEM") in March of 2022. SEM then repackaged the calcium sulphate and sold it to Royal Canin Canada ("Royal Canin") for use as an ingredient in pet food. During its production process, Royal Canin discovered that the calcium sulphate was contaminated with plastic material. Forced to discard the food it had produced, Royal Canin made a claim upon SEM for its costs and lost profits, which Plaintiff Nationwide Agribusiness Insurance Company ("Nationwide")—SEM's insurer—paid on SEM's behalf. Nationwide now brings claims as SEM's subrogee against USG for negligence, breach of implied warranties, and breach of contract. USG has moved to dismiss Nationwide's complaint under Federal Rule of Civil Procedure 12(b)(6). As explained in more detail below, Nationwide's negligence claim is dismissed, but USG's motion is otherwise denied.

<u>**BACKGROUND**</u>

The following facts are taken from Plaintiff's complaint and accompanying exhibits and are accepted as true for purposes of this motion. Nationwide, an Iowa corporation with its principal place of business in Iowa, is the general liability insurance carrier for SEM, an Illinois corporation that operates a facility in Quincy, Illinois. (Am. Compl. [10] ¶ 1; Ex. F to Am. Compl. [10-6].) USG,

---

[1] The parties use this spelling in their briefing and the court will follow their lead, except where directly quoting documents in the record that use the alternate spelling "sulfate."

a Delaware corporation with its principal place of business in Chicago, Illinois, is one of SEM's suppliers; USG ships calcium sulphate in bulk to SEM's Quincy facility.  (Am. Compl. ¶¶ 2, 6.) SEM then repackages this raw material and ships it to customers, including Royal Canin, for use in manufacturing.  (*Id.* ¶ 12.)

On March 4, 2022, SEM issued Purchase Order L139357 to USG for 50,000 pounds of "Bulk Calcium Sulfate F-Grade 18% Coarse."  (*Id.* ¶ 7; *see* Ex. A to Am. Compl. [10-1].)  USG's Safety Data Sheet for this product lists its recommended use as "Animal Feed."  (Am. Compl. ¶ 28; *see* Ex. I to Am. Compl. [10-9] at 1.)  USG issued an Order Acknowledgment the same day and scheduled a delivery date of March 24, 2022.  (Am. Compl. ¶ 8.)  USG's Order Acknowledgment contained a disclaimer at the bottom of the page, which stated:  "This sale is governed by USG's terms and conditions of sale, which may be found at usg.com or by clicking on  https://www.usg.com/USG-terms-and-conditions-US-transactions.pdf (for sales in the U.S.) . . . ."  (Ex. B. to Am. Compl. [10-2].)

On or around March 24, 2022, shipping company Autumn Trucking ("Autumn") took delivery of the bulk calcium sulphate order from USG's facility in Detroit, Michigan for transport to SEM's facility in Quincy.  (Am. Compl. ¶ 9.)  The last load that Autumn's truck had transported before completing this pickup was clay, and USG certified that Autumn had pressure-cleaned the truck prior to receiving the shipment.  (*Id.*; *see* Ex. C. to Am. Compl. [10-3]; Ex. D to Am. Compl. [10-4].)  USG issued a Bill of Lading with the number 000008266484 in recognition of the shipment, which Autumn delivered to SEM's Quincy facility on or around March 25, 2022.  (Am. Compl. ¶ 11.)  The Bill of Lading contained the following language in much smaller print on the bottom of its first page:

> This confirms the contract with customer for sale of the goods which is subject to and includes the USG Terms and Conditions of Sale previously provided or made available to customer.  The property described has been received by Carrier in apparent good order, except as noted, and is marked, consigned, and destined as indicated.

2

(Ex. E to Am. Compl. [10-5] at 1.)  The Bill of Lading listed the customer as SEM and the total pricing quantity as 22.34 tons.  (*Id.*)  A space on the form for "provid[ing] additional damage/shortage documentation notations" is left blank.  (*Id.*)  The Bill of Lading was signed and dated March 25, 2022 under the "Signature of Receiver" field, though the identity of the signer is not clear.  (*Id.*)

SEM repackaged the calcium sulphate into one-ton totes (that is, storage boxes) at its Quincy facility and, at an unspecified later date, sold at least some of those totes to Royal Canin in Guelph, Ontario, Canada.  (Am. Compl. ¶ 12; Ex. F. to Am. Compl. [10-6].)  Royal Canin then began using the calcium sulphate to produce pet food.  (Am. Compl. ¶¶ 13–14.)  Midway through its production process, however, Royal Canin discovered that the calcium sulphate was contaminated with foreign material.  (*Id.* ¶ 14.)  Testing showed that this material included polyethylene terephthalate ("PET"), a polymer that is commonly used in plastic packaging.  (*Id.* ¶¶ 15–16.)  By that point, Royal Canin had already blended eleven totes of the contaminated material with other ingredients to make pet food, and was forced to discard this entire batch as inedible.  (*See* Pl.'s Ex. F.)

Royal Canin made a claim of $1.6 million Canadian dollars upon SEM for its costs associated with the contaminated and unusable raw material, unsaleable finished pet food material, transportation and disposal, and lost profits.  (*Id.*; Am. Compl. ¶ 18.)  SEM tendered the claim to its insurer Nationwide, which paid the claim on SEM's behalf.  (Am. Compl. ¶¶ 19–20.)  In consideration of this payment, Royal Canin and SEM assigned all claims and legal title to all causes of action arising out of the contamination incident.  (*Id.* ¶¶ 21–24.)  Nationwide's claim representative Daniel DeCristofaro contacted USG via email on August 22, 2022 and notified USG that "[b]ased upon our investigation, and discussion with SEM Materials, we have concluded the foreign material was received in the bulk shipment from [USG]."  (Pl.'s Ex. F; Am. Compl. ¶ 25.)  Nationwide's representative further stated: "I believe [SEM's General Manager] Keith Mizwicki . . . has had discussions with you concerning this matter."  (Pl.'s Ex. F.)  Nationwide's

complaint states that "[u]pon information and belief, Keith Mizwicki of SEM had previously provided USG with notice of the contaminated material in the USG Bill of Lading 000008266484 material." (Am. Compl. ¶ 25.)  Nationwide does not specify the precise method in which Mizwicki provided this notice, and the court notes that there is no mention of contamination, nor of Mizwicki's name, in the Bill of Lading itself.  (*See* Pl.'s Ex. E.)

On September 16, 2022, USG's attorney Brett Nerad responded via letter to Mr. DeCristofaro's email.  (Pl.'s Ex. H to Am. Compl. [10-8].)  Mr. Nerad acknowledged that USG had in fact received notice on May 31, 2022 that Royal Canin had discovered plastic material in the shipment.   (*Id.* at 1.)  But according to Mr. Nerad, after USG received the notice, Mr. Mizwicki had visited USG's Detroit facility with a sample of the offending plastic material, met with USG's plant manager and a regional sales representative, and conducted an investigation, including a tour of the USG facility.  (*Id.*)  Based on this investigation, Mr. Nerad asserted in his letter, "USG [had] concluded —and Mr. Mizwicki agreed—that the plastic material identified by Royal Canin could not have entered into the calcium sulphate at USG's plant."  (*Id.*)  Mr. Nerad doubled down on this conclusion in his September 16, 2022 letter, noting that USG's manufacturing process filters out all foreign materials from the calcium sulphate, and that the resulting filtered material remains in a completely closed system until it is dispensed via USG's bulk loading spout for shipment.  (*Id.*)  Mr. Nerad further noted that USG had filled two other trucks with calcium sulphate on the same day SEM received its shipment and had not received any other complaints of foreign plastic material.  (*Id.* at 1–2.)

On March 29, 2023, Nationwide sued USG in this district, invoking the court's diversity jurisdiction under 28 U.S.C. § 1332.  Nationwide asserted in its First Amended Complaint[2] that "[u]pon information and belief, the PET foreign material in the calcium sulphate delivered to Royal

---

[2]     Following an initial motion to dismiss by Defendant [7], Nationwide amended its original complaint to provide proof (in the form of Mr. DeCristofaro's and Mr. Nerad's correspondence) that USG had received pre-suit notice of the product's alleged defect, as required for purposes of an implied warranty of merchantability claim.

Canin came from packaging totes used by USG"; it supported this allegation by noting that "[t]otes purchased and used by SEM do not contain PET and SEM does not add anything to the USG calcium sulphate before shipping it to its customers such as Royal Canin." (Am. Compl. ¶ 17.) Nationwide's complaint further alleged that, "[w]ell before March 25, 2022, USG was aware from its history of dealings with, communications with, and sales to SEM that SEM sold calcium sulphate supplied by USG to customers which used the calcium sulphate as an ingredient in pet food." (*Id.* ¶ 34.) Based on these facts, Nationwide asserted three counts against USG: (1) negligence; (2) breach of implied warranties; and (3) breach of contract.

USG filed a motion to dismiss Nationwide's First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) on July 14, 2023 [12]. In its motion, Defendant broadly argued that (1) Nationwide had failed to allege facts that would plausibly show USG was at fault for the contamination, and that (2) in any event, Nationwide's claims either failed as a matter of law or were barred by the Terms and Conditions of the original contract between its subrogee SEM and USG. As an exhibit attached to its supporting memorandum of law [13] ("Def.'s Br."), USG provided a copy of a document entitled "USG TERMS & CONDITIONS—U.S. OR U.S. TERRITORIES TRANSACTIONS." (*See* Ex. 1 to Def.'s Br. [13].) USG asserted that this document reflected its standard Terms and Conditions that would have been available on its website at the hyperlinked address in the Order Acknowledgment and Bill of Lading at the time of its sale to SEM in March 2022. USG's motion is now before the court for decision.

## LEGAL STANDARD

The court has diversity jurisdiction and the parties do not appear to dispute that Illinois substantive law governs all of Plaintiff's claims in this lawsuit. *See Russo v. Bank of Am., N.A.*, No. 14 CV 382, 2014 WL 3811116, at *2 (N.D. Ill. Aug. 1, 2014) (finding no dispute where both parties cited to Illinois caselaw in their briefing).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Brant v. Schneider Nat'l, Inc.*, 43 F.4th 656,

664 (7th Cir. 2022) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In making this evaluation, the court accepts all well-pleaded facts as true and draws reasonable inferences in the non-movant's favor.  *Id.*  The plaintiff's claim must be more than "merely speculative," but it need only allege "enough details about the subject matter of the case to present a story that holds together."  *Russell v. Zimmer, Inc.*, 82 F.4th 564, 570 (7th Cir. 2023) (quoting *Brant*, 43 F.4th at 664, and *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

"Generally, a district court cannot consider evidence outside the pleadings to decide a motion to dismiss without converting it into a motion for summary judgment."  *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018).  However, "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."  FED. R. CIV. P. 10(c).  Further, under the incorporation-by-reference doctrine, "a court may consider documents that are (1) referenced in the plaintiff's complaint, (2) concededly authentic, and (3) central to the plaintiff's claim."  *Fin. Fiduciaries, LLC v. Gannett Co., Inc.*, 46 F.4th 654, 663 (7th Cir. 2022).  A defendant may introduce such pertinent documents for the court's consideration by attaching them to a motion to dismiss.  *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

## DISCUSSION

In its motion, USG asserts three grounds for dismissal of Nationwide's claims:  (1) Nationwide's negligence claim is barred by the economic loss doctrine, (2) Nationwide's other two claims have been waived and disclaimed pursuant to the terms and conditions of the sale agreement between USG and SEM, and (3) all of Nationwide's factual allegations are entirely speculative and fail to plausibly state a claim for relief.  The court addresses each argument in turn.

**I.    Nationwide's First Count is Barred under Illinois' Economic Loss Doctrine**

In Count 1 of its First Amended Complaint, Nationwide asserts a claim for negligence against USG.  Specifically, Nationwide asserts that USG had a duty to use reasonable care and caution as a producer and seller of feed-grade calcium sulphate, and breached that duty by

allowing the shipment to SEM to become contaminated with PET—resulting in damages to Royal Canin in the form of wasted materials, extra expenses, and lost profits. (Am. Compl. ¶¶ 29–32.) USG argues that, regardless of whether Nationwide's factual assertions as to breach are taken as true, its negligence claim fails as a matter of law under Illinois' economic loss doctrine. The court agrees.

The Illinois Supreme Court held in *Moorman Manufacturing Co. v. National Tank Co.* that "a plaintiff cannot recover for solely economic loss under the tort theories of strict liability, negligence, and innocent misrepresentation." 91 Ill. 2d 69, 91, 435 N.E.2d 443, 453 (1982). Economic loss is defined as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property . . . ." *Id.* at 82, 435 N.E.2d at 449 (citation omitted). In other words, recovery in tort is barred where "the loss is rooted in disappointed contractual or commercial expectations." *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) (citation and internal quotation marks omitted) (applying Illinois law), *as amended on denial of reh'g* (Apr. 3, 2003). This rule arises from the principle that "[c]ontract law serves a vital commercial function by providing sellers and buyers with the ability to define the terms of their agreements with certainty prior to a transaction," and therefore, "[w]here the duty of a seller has traditionally been defined by contract . . . the theory of recovery should be limited to contract although recovery in tort would be available under traditional tort theories." *Fireman's Fund Ins. Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160, 164, 679 N.E.2d 1197, 1199 (1997) (quoting *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137, 159–60, 636 N.E.2d 503, 513 (1994)).

There are three exceptions to the "*Moorman* doctrine," just one of which is at issue here: a claimant may recover economic losses under a tort theory when the defendant's actions caused

personal injury or property damage through "a sudden, calamitous, or dangerous occurrence."[3] *Am. United Logistics, Inc.*, 319 F.3d at 927 (citing *In re Chi. Flood Litig.*, 176 Ill. 2d 179, 199, 680 N.E.2d 265, 275 (1997)).  Such an occurrence violates an "extra-contractual duty between the parties, giving rise to a cause of action in tort separate from one based on the contract itself." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011).  Post-*Moorman* courts have broadened the exception beyond "sudden" events to include any defect that produces "hazardous or unreasonably dangerous" consequences.  *Am. United Logistics, Inc.*, 319 F.3d at 928 (citing cases).  Notably, however, "for the exception to apply based upon property damage, the property damaged must be property other than the allegedly defective product itself."  *Westfield Ins. Co. v. Birkey's Farm Store, Inc.*, 399 Ill. App. 3d 219, 232, 924 N.E.2d 1231, 1243 (3d Dist. 2010) (citing *Trans States Airlines v. Pratt & Whitney Can., Inc.*, 177 Ill. 2d 21, 41–42, 682 N.E.2d 45, 54–55 (1997)).  In cases involving multiple component parts of a final "product," Illinois courts apply a "bargained for" approach that bars recovery in tort from damages caused by a defective component if the parties "bargained for a fully integrated" final product that cannot be separated from the component itself, or if the damage was of the type "that one would reasonably expect as a direct consequence of, or incidental to, the failure of the defective product."  *Id.*  Both the "dangerous occurrence" and "personal injury or other property" damage elements must be independently satisfied to qualify for the exception.  *Chi. Flood*, 176 Ill. 2d at 200, 680 N.E.2d at 275.

Nationwide argues that the exception should apply here because the contamination of the calcium sulphate was a "dangerous occurrence" that caused a foreseeable risk of harm to Royal Canin's customers and caused damage to "other property" by forcing it to waste other constituent

---

[3]        The other two exceptions are "where the plaintiff's damages are proximately caused by a defendant's intentional, false representation" and "where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions."  *Chi. Flood*, 176 Ill. 2d at 199, 680 N.E.2d at 275.  Nationwide has not alleged that either should apply here.

ingredients and finished pet food product.[4]   In support, Nationwide cites *Blommer Chocolate Co. v. Bongards Creameries, Inc.*, where the district court applied *Moorman*'s "sudden and calamitous occurrence" exception to deny summary judgment on a plaintiff's claim for contamination of its factory and products by whey containing salmonella.  635 F. Supp. 911, 916–17 (N.D. Ill. 1985).  In addition, Nationwide cites *Board of Education v. A, , and S., Inc.*, in which, on the basis of the exception, the Illinois Supreme Court

affirmed the denial of a motion to dismiss a group of plaintiff school districts' contamination claims against manufacturers and suppliers of asbestos-containing materials used in the construction of their school facilities.  131 Ill. 2d 428, 445, 546 N.E.2d 580, 588 (1989).  USG counters by citing Seventh Circuit authority stating that, in "contamination cases" such as this one, "Illinois courts have generally rejected the application of the sudden or calamitous occurrence exception, unless the defect makes the product hazardous or unreasonably dangerous."  *Am. United Logistics, Inc.*, 319 F.3d at 927–28 (citing *Dixie-Portland Flour Mills, Inc. v. Nation Enters., Inc.*, 613 F. Supp. 985, 989 (N.D. Ill. 1985); *NBD Bank v. Krueger Ringier, Inc.*, 292 Ill. App. 3d 691, 695–96, 686 N.E.2d 704, 708 (1st Dist. 1997); and *Cloverhill Pastry-Vend Corp. v. Cont'l Carbonics Products, Inc.*, 214 Ill. App. 3d 526, 574 N.E.2d 80, 82–83 (1st Dist. 1991)).

---

[4]      Nationwide also argues, in passing, that USG mistakenly conflates monetary damages with "economic loss" and that a tort plaintiff who has suffered non-economic "physical injury" may seek and receive such damages.  (Pl.'s Br. at 10 (citing *Vaughn v. General Motors Corp.*, 118 Ill. App. 3d 201, 204, 454 N.E.2d 740, 742 (3d Dist. 1983), and *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 568 (7th Cir. 2012)).)  Neither argument warrants much discussion.  As an initial matter, the theory in *Vaughn* that a plaintiff may recover in tort "when the damage caused by a defective product is confined to the product itself" was overruled decades ago by the Illinois Supreme Court in *Trans States Airlines*, 177 Ill. 2d at 42, 682 N.E.2d at 55.  The appellate court in *Vaughn* separately noted that *Moorman* did not define "economic loss" as "simply monetary damages," but rather "closely allied [this idea] to the contract concept of loss of benefit of bargain." 118 Ill. App. 3d at 204, 454 N.E.2d at 742.  But while this portion of *Vaughn*'s holding is still good law, it is irrelevant here: Defendant has made no mention of Plaintiff's request for monetary damages in making its case for why the economic loss doctrine should apply.  *Wigod* was a case involving a common-law tort claim against a home mortgage servicer for refusing to modify the terms of the plaintiff's loan.  The Seventh Circuit in *Wigod* acknowledged that the *Moorman* doctrine does not apply to claims of "physical injury," but concluded that the plaintiff's claim was "purely economic" and did *not* qualify for this exception.  673 F.3d at 568.

The court concludes that the *Moorman* doctrine bars Nationwide's negligence claim. As an initial matter, it is not clear that Nationwide has pleaded facts sufficient to support a conclusion that the PET contamination met the high standard set by Illinois courts for what constitutes a "sudden or dangerous" event in the contamination context. This case is highly similar, in particular, to *Cloverhill Pastry Vend-Corp.*, in which the plaintiff discovered that a piece of equipment that the defendant had sold to the plaintiff for use in their baked goods business was dispersing flakes of metal throughout the plaintiff's pastry dough. Affirming dismissal of plaintiff's complaint, the Illinois appellate court noted that the plaintiff "ha[d] not indicated how [defendant's] products were inherently dangerous or caused [plaintiff's] baked goods to become inherently dangerous," and that "the fact that the baked goods were contaminated [does not] automatically require[] a finding that the[y] . . . were toxic or presented a threat to human life." 214 Ill. App. 3d at 529, 574 N.E.2d at 82. The *Cloverhill Pastry* court cited with approval the federal district court opinion in *Dixie-Portland Flour Mills, Inc. v. Nation Enterprises, Inc.*, another "contamination" case that refused to apply the "sudden and dangerous" exception where the contamination of the plaintiff's flour with sand merely "made the [final] product unfit for its intended use" and "deprive[d] the plaintiff of the benefit of its bargain." 613 F. Supp. at 989. "The flour was simply bad," meaning that plaintiff's "commercial expectations were unfulfilled." *Id.* Here, too, Nationwide has not expressly alleged anywhere in its complaint or briefing that the contamination could have produced *unreasonably* dangerous products—only that it rendered the finished pet food "inedible, undigestible, and unsaleable," posing a risk of "foreseeable harm to any animal" that consumed it. (Pl.'s Opp. to USG Corp.'s Mot. to Dismiss Am. Compl. [15] ("Pl.'s Br.") at 11.) If metal flakes in baked goods intended for human consumption are not "inherently dangerous" under Illinois law, *Cloverhill Pastry*, 214 Ill. App. 3d at 529, 574 N.E.2d at 82, it is hard to see how plastic pieces in animal feed could meet this standard.

More importantly, this case need not even reach the question of whether the PET contamination was "unreasonably dangerous," because Nationwide has not adequately alleged

any injury to person or "other property."  Both of the cases that Nationwide cites for support involved contaminated products that caused some damage beyond the final step in their contracted-for manufacturing process. In *Blommer*, the defendant's contaminated whey caused a salmonella outbreak and forced the plaintiff to decontaminate not just its own facility but also its customers' facilities.[5]  In *A, C & S, Inc.*, the defendants' asbestos-containing materials were installed in ceilings, walls, and other insulated components, but ultimately caused contamination throughout the plaintiffs' school buildings—including "classrooms, libraries, kitchens, auditoriums, and maintenance facilities"—through airborne dispersal.  131 Ill. 2d at 449, 546 N.E.2d at 590. Reviewing a lower court's order dismissing the case, the Illinois Supreme Court held that the defective product (the asbestos-containing materials) caused sufficient damage to property beyond the scope of the plaintiffs' bargain (the plaintiffs' school facilities) to escape dismissal under the economic loss doctrine.  *Id.* at 446, 546 N.E.2d at 588 ("[I]t would be incongruous to argue there is no damage to other property when a harmful element exists throughout a building or an area of a building which by law must be corrected and at trial may be proven to exist at unacceptably dangerous levels.")[6]

Here, in contrast, Nationwide has not alleged that the contaminated calcium sulphate caused damage to any "other property" beyond the final product itself.  For example, Nationwide

---

[5]       While *Blommer* also recognized that the damage to the plaintiff's contaminated chocolate inventory might itself be considered a "sudden and calamitous occurrence" actionable in tort, the court notes that it reached this conclusion based in part on the 1984 *Vaughn* case, (which, as noted, has since been overruled by the Illinois Supreme Court's 1997 holding in *Trans States Airlines* that a defective product's damage to itself cannot provide the sole foundation for a negligence claim).  *Blommer*, 635 F. Supp. at 916–17 (citing *Vaughn v. Gen. Motors Corp*, 102 Ill. 2d 431, 435–36, 466 N.E.2d 195, 197 (1984)); *see Trans States Airlines*, 177 Ill. 2d at 42, 682 N.E.2d at 55.

[6]       The *Trans States Airlines* court explicitly categorized *A, C & S* as an "other-property" case outside the scope of *Vaughn*'s holding.  *Trans States Airlines*, 177 Ill. 2d at 33, 682 N.E.2d at 50–51.  It also noted that *A, C & S* is an "asbestos case" that "do[es] not easily fit within the framework delineating tort and contract" in light of the unique nature of asbestos damages.  *Id.* at 43, 682 N.E.2d at 55; *see A, C & S*, 131 Ill. 2d at 445, 546 N.E.2d at 588.

does not allege that the contaminated food was released onto the market and caused harm to Royal Canin's customers, or consequent reputational damage to Royal Canin itself. *See Medefil, Inc. v. Sci. Protein Lab'ys, LLC*, No. 13 CV 4773, 2015 WL 3962820, at *4 (N.D. Ill. June 26, 2015) ("As [plaintiff] was not the ultimate consumer of the [defective final product], it cannot argue that it suffered personal injury from use of the product"). Nor does Nationwide argue that the contamination harmed SEM's or Royal Canin's employees or caused damage to any of their property external to the pet food supply chain and manufacturing process. The only damages it identifies are the loss of Royal Canin's finished pet food product and other constituent ingredients that were blended with the calcium sulphate in order to make this final product, plus lost profits and incidental costs incurred in transporting and disposing of these materials. Such losses are "reasonably foreseeable as a direct consequence of the failure of the defective product" in a deal for raw ingredients to manufacture pet food, and fall within the scope of risk allocated by the original bargains between USG, SEM, and Royal Canin. *Trans States Airlines*, 177 Ill. 2d at 51, 682 N.E.2d at 58; *see Westfield Ins. Co.*, 399 Ill. App. 3d at 232, 924 N.E.2d at 1243; *Dixie-Portland*, 613 F. Supp. at 989 (noting that "mix[ing] [a defective ingredient] with other ingredients and wast[ing] materials . . . falls more within the contract realm of diminished expectations than within the accident realm of torts"); *TreeHouse Foods, Inc. v. SunOpta Grains & Foods Inc.*, No. 18 C 1412, 2019 WL 1429337, at *9 (N.D. Ill. Mar. 29, 2019) ("The damage to finished products, equipment, and raw materials . . . arose from 'disappointed expectations' of a commercial bargain and cannot be recovered in tort.") (quoting *Moorman*, 91 Ill. 2d at 85, 435 N.E.2d at 450); *cf. In re StarLink Corn Prod. Liab. Litig.*, 212 F. Supp. 2d 828, 841–42 (N.D. Ill. 2002) (holding that economic loss doctrine would apply if the plaintiff farmers had *themselves* bought contaminated

seeds, but that contamination from *others'* seeds or crops rendered it inapplicable since the plaintiffs had "no opportunity to negotiate contractual protection").[7]

Accordingly, the court holds that Nationwide's negligence claim is barred under Illinois' economic loss doctrine.

## II.    The Terms and Conditions of USG's and SEM's Agreement Do Not Warrant Dismissal of Nationwide's Second and Third Counts at This Stage

Counts Two and Three of the First Amended Complaint are claims for breach of implied warranties and breach of contract. Nationwide alleges that the calcium sulphate's contamination with PET rendered it nonmerchantable (that is, unsuitable for the ordinary purpose for which it is typically sold) and unfit for SEM's particular purpose as an ingredient in pet food. (Am. Compl. ¶¶ 33–37.) Nationwide further argues that USG and SEM entered into an enforceable contract for the sale of calcium sulphate, and that USG breached the terms of this contract by supplying contaminated material that did not meet its published product specifications. (*Id.* ¶¶ 38–41; *see* Pl.'s Ex. I).

USG argues that the warranty and breach of contract claims (as well as Nationwide's negligence claim) are waived and disclaimed. Regardless of whether Nationwide's allegations support such claims, USG contends, its subrogor SEM has already surrendered them by accepting USG's Terms and Conditions. Specifically, USG points to fine-print language in its Order Acknowledgment and Bill of Lading stating that the transaction is governed by USG's

---

[7]    This case does present a slightly different factual pattern from those cited above in that it involves not one "bargained-for" exchange, but *two*: USG's sale of the raw calcium sulphate to SEM, and SEM's sale to Royal Canin. Nationwide brings its claims as SEM's subrogee, and it is arguable that SEM (as an intermediate supplier of raw material) bargained with USG for a discrete and separate product in a way that Royal Canin (as a manufacturer of final goods) did not. *Cf. Trans States Airlines*, 177 Ill. 2d at 50, 682 N.E.2d at 58. In this case, however, SEM's presence as intermediary does not change the analysis. Nationwide has alleged that USG knew SEM purchased the calcium sulphate for a likely final use as an ingredient in pet food. (*See* Am. Compl. ¶ 34.) Because any injuries to SEM from defective raw materials that it purchased and repackaged would flow from those incurred by its customers, it is reasonable for these purposes to treat the overall supply chain as a single "bargain" that contemplates the damages Royal Canin ultimately suffered.

standard "terms and conditions of sale." (*See* Pl.'s Ex. B; Pl.'s Ex. E.) Nationwide has attached copies of both documents as exhibits to its complaint, but neither copy includes the full text of these Terms and Conditions; they are only referenced as being available on USG's website via a hyperlink. In support of its motion, however, USG has supplied the text of what was purportedly available on this website at the time of its bargain with SEM. (*See* Def.'s Ex. 1.) Section Four of USG's attached document includes the following language:

> **4. Product Inspection; Non-conformity.** Customer must inspect the Products within 48 hours after delivery and notify USG in writing of any physical damage to the products or non-conformity with the purchase order or invoice. Failure to make inspection and deliver written notice of such damage or non-conformity within such 48 hour period shall constitute irrevocable acceptance of the delivered Products and a waiver of any damage or non-conformity that was or should have been detected. At USG's election, the inspector inspecting the Products shall be subject to USG's approval. As Customer's sole remedy for any damaged or non-conforming Products of which Customer has delivered to USG timely notice, USG, at USG's election, shall either: (a) replace the damaged or non-conforming Products or (b) refund the price paid by Customer to USG for such damaged or non-conforming Products.

(*Id.* at 1.) Based on this language, USG argues that—even if, as Plaintiff alleges, the calcium sulphate was already contaminated upon arrival at SEM's facility—it was SEM's responsibility upon delivery to inspect the shipment within 48 hours and notify USG of any damage. Its failure to do so, USG claims, means that SEM (and by extension, its subrogee Nationwide) has waived any and all claims for "damage or nonconformity" of the shipment, including its negligence, breach of implied warranties, and breach of contract claims.

In addition, Section Six of the "Terms and Conditions" document contains the following bolded, all-caps language:

> **6. WARRANTY AND DAMAGES DISCLAIMER.**
>
> a. **Warranty:** For Products manufactured by USG (except USG Ceilings Plus, LLC), the warranty that applies to the Products is either USG's product-specific limited warranty (please see USG's Product Warranty Page for a list of products covered by a specific warranty), or, for Products with no product-specific warranty, USG's standard limited warranty (see USG's Standard Limited Warranty).
>
> . . .

**b.    DISCLAIMER: THE WARRANTY DESCRIBED ABOVE IS THE ONLY WARRANTY APPLICABLE TO THE PRODUCTS AND EXCLUDES ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY IMPLIED WARRANTIES OTHERWISE ARISING FROM A COURSE OF DEALING OR USAGE OF TRADE, EXCEPT WHERE PURCHASE OF THE PRODUCTS IS SUBJECT TO CONSUMER PRODUCT WARRANTY LAWS, IN WHICH INSTANCES ANY APPLICABLE IMPLIED WARRANTIES ARE LIMITED TO THE SHORTEST PERIOD PERMITTED UNDER SUCH LAWS. IN NO EVENT WILL USG BE LIABLE FOR ANY INCIDENTAL, SPECIAL, INDIRECT, OR CONSEQUENTIAL DAMAGES.**

(*Id.*)  USG argues that this language is sufficiently conspicuous to disclaim any implied warranties it might otherwise have held towards SEM.  Accordingly, USG claims that Section Six provides an independent basis for dismissing Nationwide's claim for breach of implied warranties.

Nationwide disputes whether the Terms and Conditions that USG has put before the court were ever validly incorporated into the agreement between USG and SEM to begin with. Nationwide first calls the authenticity of USG's exhibit into question, noting that the text of these generic Terms and Conditions do not specifically reference SEM or the deal in question, and that USM has not presented a basis for finding that this document matches what would have been available to SEM on USG's website at the time of its calcium sulphate purchase in March 2022. Even if the attachment *is* authentic, Nationwide argues, the manner of its presentation to SEM— via a hyperlink to an external website in boilerplate text at the bottom of an order receipt—was insufficiently conspicuous to constitute a "meeting of the minds" between the two contracting parties.  Finally, Nationwide argues that a disclaimer of implied warranties that is delivered with the goods cannot become part of the contracting parties' agreement.

### A.    Scope of Review

Waiver and disclaimer are affirmative defenses that will rarely support dismissal under Rule 12(b)(6).  This is because a plaintiff generally need not anticipate and plead around such defenses; rather, "the proper way to seek a dismissal [on this basis] . . . under most circumstances . . . [is to] answer and then move under Rule 12(c) for judgment on the pleadings."  *Burton v. Ghosh*, 961 F.3d 960, 965 (7th Cir. 2020).  A narrow exception to this principle applies, however,

15

"if the availability of a defense is apparent in the plaintiff's complaint itself." *Id.* Thus, "an affirmative defense—including waiver—based on a contract that is part of the pleadings is a proper basis for a motion to dismiss." *In re Kindra Lake Towing, L.P.*, No. 15 C 3174, 2015 WL 7351754, at *4 (N.D. Ill. Nov. 20, 2015) (collecting cases). Further, as noted, a court may consider materials outside the plaintiff's pleadings that a defendant offers in support of a motion to dismiss if they are referenced in the plaintiff's complaint and central to their claims. *Venture Assocs. Corp*, 987 F.2d at 431. This exception is "aimed at cases interpreting, for example, a contract." *Polley v. Nw. Univ.*, 560 F. Supp. 3d 1197, 1204 (N.D. Ill. 2021) (quoting *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002)). Its purpose is "to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents." *Id.*

In the case before this court, the full text of USG's Terms and Conditions is not included in the Order Acknowledgment and Bill of Lading that Plaintiff introduced as exhibits to its complaint, but these documents do point to the existence of these general Terms via hyperlinks to USG's website. Neither party has provided any authority addressing the question of whether an externally hyperlinked document may be validly incorporated into a contract between two merchants that is formed via an exchange of forms. The court itself has uncovered some district court decisions answering this question in the affirmative, but has not found any controlling authority on this point. *See, e.g.*, *Plymouth Tube Co. v. Pilepro Steel*, LP, No. 15 C 10353, 2017 WL 4707454, at *7 (N.D. Ill. Oct. 19, 2017) (finding, under Illinois law, that agreement between parties validly incorporated seller's standard terms and conditions provided via website hyperlink in order acknowledgment); *see also, e.g.*, *Nu-X Ventures v. SBL, LLC*, 568 F. Supp. 3d 829, 834–35 (W.D. Ky. 2021) (finding that hyperlinked terms and conditions in seller's acceptance were incorporated into the parties' contract under Kentucky law). Assuming, however, that the online Terms and Conditions can be validly incorporated in at least some circumstances, they are clearly essential "to understand the nature of the dispute before the parties" since the Order Acknowledgment (Plaintiff's Exhibit B) states that they govern the transaction between USG and

SEM.  *See 188 LLC*, 300 F.3d at 735; *see also Venture Assocs. Corp.*, 987 F.2d at 431–32 (holding that district court properly considered documents and correspondence referenced but not included in the plaintiff's complaint since they "constitute the core of the parties' contractual relationship").  As explained here, "there remain factual issues as to whether [the content of USG's exhibit] actually was incorporated into the contract," but the court will address its terms in deciding, for purposes of this motion, whether those terms defeat Plaintiff's warranty and breach of contract claims.  *188 LLC*, 300 F.3d at 735.

### B.      Formation under UCC 2-207

The remaining questions, then, are (1) whether the Terms and Conditions were in fact incorporated into the contract between USG and SEM, and (2) if so, whether they should be read to waive or disclaim Nationwide's remaining counts for breach of implied warranties and breach of contract.  The parties do not dispute that this is a sale of goods between two merchants, so the Uniform Commercial Code (as adopted in Illinois) governs resolution of these questions.

"In Illinois, an offer, an acceptance and consideration are the basic ingredients of a contract."  *Thompson Fine Art, Ltd. v. Union League Club of Chicago*, 2022 IL App (1st) 210391-U, ¶ 24 (citation omitted).  Nationwide asserts in its pleading that "USG contracted with SEM" when it "accept[ed] SEM's Purchase Order L139357 and issu[ed] Bill of Lading 000008266484" for the shipment of the calcium sulphate.  (Am. Compl. ¶ 39.)  It is unclear from this statement, and the parties do not address in their briefing, which of these two documents—i.e., USG's March 4, 2022 Order Acknowledgment, or its March 25, 2022 Bill of Lading—constituted its official "acceptance" that formed a binding contract between the parties.  Under UCC Section 2-206, a seller may accept a buyer's offer "to buy goods for prompt or current shipment . . . either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods . . . ."  810 ILCS 5/2-206.  Here, the Order Acknowledgment lists the number of SEM's March 4 Purchase Order, confirms the quantity and price terms listed in said Order, and schedules a delivery date for the calcium sulphate.  (*See* Pl.'s Ex. B.)  The Bill of Lading, in contrast, states

17

in fine print that it merely "*confirms the contract* with customer for sale of the goods which is subject to and includes the USG Terms and Conditions of Sale previously provided to or made available to customer." (Pl.'s Ex. E at 1 (emphasis added).) Thus, the court concludes that USG and SEM formed a contract with their exchange of documents on March 4, 2022. *See Plymouth Tube Co.*, 2017 WL 4707454, at *5 (finding that purchase order constituted offer and order acknowledgment constituted acceptance); *Vanlab Corp. v. Blossom Valley Foods Corp.*, No. 04 CV 6183, 2005 WL 43772, at *3 (W.D.N.Y. Jan. 10, 2005) ("[A] bill of lading issued after the formation of a contract and not referred to in that contract serves only as a receipt for the transfer of the goods, and will not serve to alter the terms of the previous agreement.").

In this court's view, whether USG's standard Terms and Conditions linked in the March 4 Order Acknowledgment were validly incorporated into its contract with SEM is a matter governed by UCC § 2-207, referred to as the "battle of the forms" provision. Though not addressed by the parties themselves, § 2-207 appears to be directly applicable: "[o]nce a contract of sale is established, UCC § 2–207 determines whether additional terms are made a part of that contract." *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1008 (7th Cir. 1996); *see also* 810 ILCS 5/2-207 cmt. 1 (noting that one of the "typical situations" that § 2-207 is meant to address is "the exchange of printed purchase order and acceptance (sometimes called 'acknowledgment') forms"). Under § 2-207, a party may validly accept an offer for the sale of goods even if its acceptance adds additional terms not present in the offer, as long as the acceptance is timely and is not expressly conditioned on assent to these terms. *See* 810 ILCS 5/2-207(1). In deals between merchants, these additional terms automatically become part of the contract unless "(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." *Id.* at 5/2-207(2). Here, USG's acceptance (the Order Acknowledgment) contained additional terms (the online Terms and Conditions) not present in the initial offer (SEM's Purchase Order). SEM's Purchase Order did not expressly limit

acceptance to its terms and Nationwide has not suggested that SEM objected to the Terms and Conditions, meaning that SEM (and Nationwide) could be bound by those Terms and Conditions, unless they materially altered the deal.

The court is not, however, willing "[o]n this record, . . . [to] say that [these Terms] w[ere] incorporated into the parties' contract as a matter of law." *188 LLC*, 300 F.3d at 737. First, Nationwide raises a legitimate dispute over whether USG's exhibit accurately reflects what SEM would have found upon clicking on USG's website in March 2022. "For a contract to incorporate all or part of another document by reference, the reference must show an intention to incorporate the document and make it part of the contract." *188 LLC*, 300 F.3d at 736 (quoting *Wilson v. Wilson*, 217 Ill. App. 3d 844, 853, 577 N.E.2d 1323, 1329 (1st Dist. 1991)). In *188 LLC*, the defendant asked the court to review a copy of its standard terms and conditions which—it contended—had been printed on the reverse side of its initial offer letter; the plaintiff disputed whether these terms had actually been included with the document it received. The Seventh Circuit held that while the district court had not erred in considering the defendant's submission, there was ambiguity over whether these terms had actually been incorporated into the parties' contract that could not "be resolved [on a motion to dismiss] by reference to [the plaintiff's] complaint and the contract documents before the court." *Id.* at 738 (citing *Landmark Structures, Inc. v. F.E. Holmes & Sons Constr. Co.*, 195 Ill. App. 3d 1036, 1046–48, 552 N.E.2d 1336, 1342– 43 (5th Dist. 1990)).

The situation here is even more uncertain than in *188 LLC* because USG does not assert that the full text of its Terms and Conditions was included in any document provided to SEM. That full text would only have been available via an external hyperlink to USG's website. The text of the document that USG has attached as an exhibit to its motion to dismiss makes no reference to SEM or to its transaction with USG. And while this document is dated July 30, 2019 and is listed in the margins as having most recently been revised on August 7, 2019, both of which predated SEM's March 2022 purchase, there is nothing in the exhibit or USG's briefing that would

19

confirm whether it was or was not modified again prior to March 2022. (*See* Def.'s Ex. 1.). At a minimum, Nationwide is entitled to seek discovery on these factual questions.

Moreover, even if USG's exhibit is an authentic reproduction of the Terms and Conditions that would have been available to SEM at the time of its transaction, on a Rule 12(b)(6) motion, the court is unable to conclude that USG's waiver and disclaimer provisions satisfy § 2-207's requirements for incorporating additional terms via an acceptance. As noted, the parties have presented no controlling authority on whether—and under what circumstances—additional terms available only via an external link may validly be incorporated by reference into a contract between two merchants.[8] Further, UCC § 2-207(2)(b) states that such terms do not become part of the contract if they "materially alter" the contract between a buyer and seller. An additional term is material if it would "result[] 'in surprise or hardship if incorporated without express awareness by the other party.'" *Comark Merch., Inc. v. Highland Grp., Inc.*, 932 F.2d 1196, 1201 (7th Cir. 1991) (quoting 810 ILCS 5/2-207 cmt. 4). Illinois courts focus on the "surprise" element and ask "whether the addition constitutes an unreasonable surprise to one of the bargaining parties." *Imperial Crane Servs., Inc. v. Cloverdale Equip. Co.*, No. 13 C 4750, 2015 WL 4751100, at *3

---

[8]     Nationwide argues that the hyperlinked terms were not conspicuous enough to form part of a "meeting of the minds" between USG and SEM. Nationwide offers no authority in support of this argument, and the court is uncertain of its merit. The UCC does mandate that some specific terms, such as terms disclaiming implied warranties, must be conspicuous, *see* 810 ILCS 5/2-316, but this does not necessarily apply more generally to references incorporating external terms and conditions. And while insufficiently conspicuous hyperlinks to a seller's standard terms and conditions may be unenforceable in at least some contexts involving individual consumers, *see, e.g.*, *Zuniga v. Major League Baseball*, 2021 IL App (1st) 201264, ¶ 21, 196 N.E.3d 12, 23–24, the court has not found any authority indicating that this principle applies in a contract between two sophisticated merchants.

Nationwide also argues, in a single sentence without further elaboration, that "a disclaimer of warranties which is delivered with the goods is insufficient." (Pl.'s Br. at 12–13 (citing *Bell Fuels, Inc. v. Lockheed Elecs. Co.*, 130 Ill. App. 3d 940, 947, 474 N.E.2d 1312, 1317 (1st Dist. 1985).) This argument might have more purchase if USG had formed a contract with SEM via its March 25, 2022 Bill of Lading that accompanied the calcium sulphate delivery to SEM's Quincy facility. But the court has already found that it was the March 4 Order Acknowledgement—which referenced the Terms and Conditions via hyperlink—which should be treated as USG's official "acceptance." Accordingly, the waiver and disclaimer provisions were "delivered" to SEM twenty-one days before the goods arrived, rendering Nationwide's argument based on *Bell Fuels* inapposite.

(N.D. Ill. Aug. 11, 2015) (quoting *Clifford-Jacobs Forging Co. v. Capital Eng'g & Mfg. Co.*, 107 Ill. App. 3d 29, 33, 437 N.E.2d 22, 25 (4th Dist. 1982)).  The Seventh Circuit has explained that

> [a] term inserted by the offeree is ineffectual . . . if the new term (a) makes a material alteration, in the sense that consent to it cannot be presumed, and (b) there is no showing that the offeror in fact consented to the alteration—whether (i) expressly, or (ii) by silence against the background of a course of dealings.

*Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1009 (7th Cir. 1996) (quoting *Union Carbide Corp. v. Oscar Mayer Foods Corp.*, 947 F.2d 1333, 1337 (7th Cir. 1991)).  In determining whether an additional term would pose an unreasonable surprise, "courts may consider the course of conduct and prior dealings between the parties, as well as customary industry usage of the term."  *Imperial Crane Servs.*, 2015 WL 4751100, at *3.  The parties' history of dealing is particularly important in this analysis, "shedding bright lights on whether a provision is a material alteration."  *Nw. 1 Trucking, Inc. v. Haro*, 613 F. Supp. 3d 1081, 1099 (N.D. Ill. 2020); *see also TSR Silicon Res., Inc. v. Broadway Com Corp.*, No. 06 CIV. 9419 (NRB), 2007 WL 4457770, at *3 (S.D.N.Y. Dec. 14, 2007) ("[I]t is well-settled under Illinois law that such consent may be implied from the offeror's failure to seasonably object to an additional term of acceptance that is consistently included in sales invoices over the course of a series of transactions.") (citing cases).

In determining what does and does not constitute a "material" change, Illinois courts have frequently referred to the examples included in the UCC's official commentary to § 2-207.  *Comark Merch.*, 932 F.2d at 1201.  Comment Four to § 2-207 lists examples of clauses that would typically be considered material if added to an agreement without the other party's express knowledge and consent, including clauses "requiring that complaints be made in a time materially shorter than customary or reasonable," and clauses "negating such standard warranties as that of merchantability or fitness for a particular purpose in circumstances in which either warranty normally attaches . . . ."[9]  810 ILCS 5/2-207 cmt. 4.  Comment Five, in contrast, lists examples of

---

[9]     Several courts have interpreted this language as a per se rule that "[a] term disclaiming warranties . . . is undoubtedly a term that materially alters a contract" under Illinois

clauses that should typically not be regarded as material, including clauses "fixing a reasonable time for complaints within customary limits," as well as clauses "limiting remedy in a reasonable manner" in accordance with UCC § 2-719.[10]  *Id.* at § 5/2-207 cmt. 5.

The court cannot determine based on the current record that either Section Four's 48-hour inspection-or-waiver clause or Section Six's disclaimer of implied warranties would be considered nonmaterial under these standards.  USG argues that SEM was a sophisticated commercial player who was put on notice of its Terms and Conditions through the two firms' prior course of dealings.  But neither Nationwide's pleadings nor USG's Terms and Conditions document give the court enough insight into the scope or length of this commercial relationship to confirm whether this is accurate.  Nationwide's complaint states only that USG was SEM's supplier "[a]t all relevant times" (Am. Compl. ¶ 6), had a "history of dealings with, communications with, and sales to SEM" (*id.* ¶ 34), and should accordingly have been aware of SEM's intended use of the calcium sulphate for pet food (*id.*).  The court presumes the truth of that allegation, but it does not clarify precisely how long USG has been SEM's supplier, how many transactions the two companies completed prior to March 2022, whether USG always provided the same standard Terms and Conditions in the same way throughout these prior dealings, or whether SEM did in fact object to USG's terms

---

law.  *Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill. App. 3d 338, 347, 408 N.E.2d 1041, 1048 (1st Dist. 1980); *see also Trans-Aire Int'l, Inc. v. Northern Adhesive Co.*, 882 F.2d 1254, 1263 (7th Cir. 1989); *Imperial Crane Servs.*, 2015 WL 4751100, at *3–4; *cf. Leica Geosystems, Inc. v. L.W.S. Leasing, Inc.*, 872 F. Supp. 2d 1191, 1199–1200 (D. Colo. 2012) (applying Colorado's version of § 2-207 to find that warranty disclaimer in standard terms referenced via external hyperlink in seller's acceptance "materially alter[ed]" the parties' contract and were thus not incorporated).  *But see R.O.W. Window Co. v. Allmetal, Inc.*, 367 Ill. App. 3d 749, 754–55, 856 N.E.2d 55, 60–61 (3d Dist. 2006) (finding, without discussing § 2-207, that parties' agreement incorporated warranty disclaimer included on invoices sent with goods over several years of transactions).

[10]     *See S. Ill. Riverboat Casino Cruises, Inc. v. Triangle Insulation & Sheet Metal Co*, 302 F.3d 667, 674–75 (7th Cir. 2002) (finding, in affirming grant of summary judgment, that an additional clause in the seller's acceptance excluding consequential damages and limiting the buyer's remedies to the product's purchase price was nonmaterial based on Comment 5) (citing *Intrastate Piping & Controls, Inc. v. Robert-James Sales, Inc.*, 315 Ill. App. 3d 248, 250–54, 733 N.E.2d 718, 720–23 (1st Dist. 2000)); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 1627458, at *10–11 (N.D. Ill. Mar. 26, 2003) (citing *Intrastate Piping* and *Southern Illinois Riverboat Casino Cruises* in finding the same).

at any point during this relationship.  *Cf. Waukesha Foundry*, 91 F.3d at 1009 (finding, in affirming summary judgment for defendant, that additional provisions were not "material" in light of evidence of a significant course of dealing between the parties, including the plaintiff's receipt of "more than four hundred packing slips and invoices" containing the disputed terms over a four-year period). USG alleges in its briefing that SEM "had received multiple bills of lading, purchase order acknowledgments, and other documents, all of which contained a conspicuous disclaimer and link to the terms and conditions that governed the sale between the two."  (See Reply in Supp. of Def.'s 12(b)(6) Mot. to Dismiss Pl.'s First Am. Compl. [16] at 9).  But these assertions go to facts outside the pleadings.[11]  If, contrary to USG's assertions, SEM was a relatively new customer of USG's who had little previous exposure to the Terms and Conditions, this could weigh in favor of finding their waiver and disclaimer provisions an "unreasonable surprise" that materially altered the parties' deal.  *See Comark Merch.*, 932 F.2d at 1202; *Nw. 1 Trucking*, 613 F. Supp. 3d at 1101.

In addition, the court lacks sufficient context to conclude whether Section Four's 48-hour time limit for inspecting shipments and making complaints is reasonable or within the industry's "customary limits."  810 ILCS 5/2-207 cmt. 5.  This allocation of risk appears at least facially asymmetrical, particularly with respect to an intermediary in a supply chain like SEM, which may be required to repackage and send out shipments quickly and may not have time to adequately inspect all incoming material within the timeframe mandated by USG.  It is not clear whether SEM reasonably could have discovered the PET contamination in a 22-ton shipment of calcium

---

[11]    By the same token, even if USG *had* introduced other documents purporting to establish the scope and length of its commercial relationship with SEM, the court could not consider any such submissions—other than those that constitute the parties' contract—without converting this into a motion for summary judgment and giving Nationwide "a reasonable opportunity to present" material in opposition.  FED. R. CIV. P. 12(d); *see Venture Assocs. Corp.*, 987 F.2d at 431.

sulphate at all, let alone within 48 hours.[12]  Without more information about how these bulk shipment contracts operate in the relevant industry, and what the general expectation would be for a party in SEM's shoes, the court cannot conclude at the pleading stage that SEM consented to Section Four as a nonmaterial addition to its contract with USG, and declines to dismiss Counts Two and Three on this basis.

III.    **Nationwide's Second and Third Counts State Plausible Claims for Relief**

USG's final argument is that all of Nationwide's counts are entirely speculative and fail to plausibly state claims for relief.  The court disagrees.

Nationwide alleges "upon information and belief" that the calcium sulphate shipment became contaminated with PET through packaging totes used by USG.  (Am. Compl. ¶ 17.) Nationwide reasons that (1) SEM's packaging totes do not contain PET and (2) SEM does not add anything to the USG calcium sulphate before shipping it to its customers such as Royal Canin. (*Id.* ¶ 17.)  As USG reads the complaint, all of Nationwide's claims hinge on this single paragraph, and Nationwide fails to provide any details about why USG (a supplier of raw bulk materials shipped via trailer) would use individual packaging totes at all, why any such totes would contain PET materials, or how the product could have become contaminated on USG's watch.  (*See* Def.'s Br. at 12–14.)  USG further notes that there are more plausible alternative explanations for how the material might have become contaminated, such as through SEM's packaging and transportation process or Royal Canin's manufacturing process.  (*Id.*)

The court is nevertheless satisfied that Nationwide's version of events presents "a story that holds together."  *Swanson*, 614 F.3d at 404.  The parties have presented a basic factual dispute over when, where, and how the PET foreign material intruded into the supply chain.  There are several inconsistencies between the stories presented in Nationwide's complaint and in

---

[12]    Relatedly, Section Four by its terms only provides for waiver of "any damage or non-conformity that was *or should have been* detected" within the prescribed 48-hour inspection period.  (Ex.  1 at 1.)  While, again, neither party raises this as an issue in briefing, the court is not certain that the PET contamination "should have been detected" within 48 hours.

USG's prior correspondence and briefing, and it is not the court's role to assess the parties' credibility or weigh these competing versions of events at this stage. In ruling on a motion to dismiss, "it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Id.* Nationwide has alleged through its complaint and accompanying exhibits that (1) USG was the source of the calcium sulphate, (2) the truck used to carry the calcium sulphate shipment to SEM's Quincy facility was cleaned prior to arriving at USG, and (3) SEM does not use PET in its packaging material or add anything to the calcium sulphate during its packaging process. Assuming the truth of these allegations, as the court must, there is at least a plausible version of events in which USG was responsible for contaminating the calcium sulphate shipment with PET. *Cf. Fullreide v. Midstates Beverage Co., Inc.*, 70 Ill. App. 3d 758, 762, 388 N.E.2d 1070, 1073 (5th Dist. 1979) (noting, in reviewing a jury verdict, that "[e]vidence of reasonable and proper handling of a product between the time it left the possession and control of the defendant manufacturer or seller and the time of the occurrence of the injury is an indication that the defect alleged to have existed at the time of the injury did not come into being in that interim, but existed prior thereto.").

Nationwide's factual allegations are sufficiently detailed to rise above the level of mere speculation. Further fact discovery might doom Nationwide's remaining breach-of-contract and breach-of-warranty claims at summary judgment—either on the basis of the Terms and Conditions or on the basis of evidence that defeats the inference that USG was the source of the contamination. But the complaint sufficiently alleges claims that USG breached its contract with, and implied warranties to, its customer SEM.

**CONCLUSION**

Count I of Nationwide's First Amended Complaint is dismissed. The court denies USG's motion as to Counts II and III. USG is directed to file its answer to those Counts in 28 days.

ENTER:

Dated:  January 30, 2024

_____
REBECCA R. PALLMEYER
United States District Judge